# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**TERYL JAMES,**
    Plaintiff,

**v.**

**FEDEX FREIGHT, INC.,**
    Defendant.

**Case No. 2:21-cv-1395-CLM**

## MEMORANDUM OPINION

Teryl James ("James") loaded and unloaded freight for FedEx Freight, Inc. ("FXF") until FXF fired him in July 2022. FXF says that it fired James for insubordination. James claims that FXF fired him (a) for leaving to take care of his wife, who was dealing with a high-risk pregnancy, and (b) because he is Black. So James sues FXF under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

FXF moves for summary judgment on all claims. (Doc. 38). For the reasons stated within, the court will **GRANT** FXF's Motion.

### BACKGROUND

#### 1. Rule 56 requirements

Unfortunately, the court must start with the rules, not the facts. Rule 56(a) requires the court to grant summary judgment if FXF "shows that there is no genuine dispute as to any material fact and [FXF] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Rule 56(c)(1) tells James how to genuinely dispute the facts FXF cites in its favor:

(c) **PROCEDURES**.

(1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1) (highlight added). As the highlighted portion shows, Rule 56 requires James to cite "particular parts" of the record if he disputes one of FXF's fact assertions. *Id.* This court's Initial Order explicitly required that James follow this rule:

The statement of facts may include up to three sections, in the following order:

• <u>Response to Moving Party's Statement of Facts (if any)</u>

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.

(Doc. 6 at 23-24) (highlight added). As shown in yellow, the court required James to (a) include his disputes in separately numbered paragraphs that mirrored FXF's stated facts and (b) cite to the part(s) of the record that support his dispute. (*Id.*). As shown in blue, the failure to follow Rule 56(c) and the court's order would result in the court treating James as admitting FXF's statements of fact. (*Id.*).

Despite these clear requirements, James responded to FXF's statement of facts like this:

**II.   Disputed Facts of Defendant**

Plaintiff disputes each of the "facts" as asserted in Defendant's brief and, instead, relies on those facts stated herein.

**III.   Plaintiff's Statement of Relevant Facts**

1.   Plaintiff, Teryl James ("James"), began his employment with FedEx Freight in or around August of 2013. (Doc. 44-3, ¶ 2).

2.   James held the position of freight Handler and was also certified as a hostler. James's shift, during the relevant time period, began at 5:30p and ended at 2.30a the following morning. (Doc. 44-3, ¶ 3).

(Doc. 45 at 6). FXF called out James' non-compliance in its reply brief and asked the court to enforce its Initial Order by considering its facts admitted. (Doc. 52 at 2). The court then allowed James to file a sur-reply brief, (doc. 57), and James again disputed none of the factual assertions that FXF made in its initial brief, (doc. 40), or its reply brief, (doc. 52).

As a result, the court finds that James violated Rule 56(c) and the court's initial order. The court thus assumes that all facts asserted by FXF and supported by the cited part of the record are true. As required by the rules, the court also assumes that all facts asserted by James and supported by some record evidence are true—even if FXF disputes them.

## 2. Statement of the Facts

Based on the above ruling, these facts are not genuinely disputed:

**A. James' job at FXF:** James started working for FXF part-time in August 2013. In 2017, FXF hired James as a full-time freight handler with hostler certification. As a freight handler, James loaded and unloaded trailers on the dock. Once James finished one trailer, he would report to the dock stand for his next assignment.

James' shift started at 5:30pm and ended at 2:30am the next day. Before clocking out at shift's end, FXF required full-time freight handlers, including James, to check with the dock stand supervisor to make sure no other trailers required loading or unloading. If there was still work to be done, freight handlers were expected to work reasonable overtime.

**B. James' termination:** James knew that he had to check in with his supervisor for possible assignments before clocking out, but sometimes violated the rule. For example, in November 2018, FXF gave James a "coaching session" for violating the rule:



James received a similar coaching session on June 26, 2020, for again leaving work without first checking with his supervisor on June 25, 2020. This violation and reproach preceded his firing by about a week.

Before the court details James' July 2020 termination, however, the court describes James' personal situation at the time. James and his wife ("Mrs. James") announced her pregnancy in March 2020. The baby was due to be born in September 2020. But the couple later learned that the pregnancy was "high risk," and Mrs. James would need to stop working and driving. James told his FXF supervisors about the risk, and his corresponding need to care for his wife, during the first week of June 2020.

James violated the check-in rule a few weeks later (June 25, 2020), as FXF recorded in the following coaching session memo:

---

**FedEx** Freight

**Corrective Action Process**
**Coaching Session**
(Note to File Only)

Name: Teryl James

Employee ID: 2591576

Location: BHM

Position: Full-Time

Date of Incident: 06/25/2020

Reason for Verbal Counseling/Coaching:

On 06/25/2020, Teryl James refused the unload another trailer due he was on his 8th hour of duty. He then was sent to the office to discuss the matter with John Ferguson and Willie Waller. He was asking to see it in policy about he has to stay past his 8th hour. John Ferguson explained to him as a full time employee you are required to work overtime when needed.

Performance/Behavioral Improvement Expectations:

Teryl is to report to a supervisor before he leaves.

Performance/Behavior Improvement Actions Recommended for Employee:

---

James says that he told his supervisor on June 25, 2020 that he needed to get home to his wife "for the prenatal procedure he told him about weeks ago and to care for her as she was having serious complications and pains." (Doc. 45, Fact #15). That said, James does not dispute that if his wife's appointments were later than 4:00am, "he would have no trouble working until 2:30am and taking his wife to her appointments." (Doc. 40, Fact #13). And James admitted in his post-deposition Interrogatory responses that he could not give an exact date for his wife's appointments and admitted that none started before 7:00am. (Doc. 39-13 at 10-11). So no evidence supports the assertion that James left to take his wife to a scheduled procedure, leaving it unclear (and thus disputed) *exactly* what happened on June 25-26, 2020. In any event, neither party disputes that (a) James was reprimanded for refusing to unload another trailer and (b) James was again told to report to a supervisor before leaving work.

James violated this rule again on July 1, 2020, when he clocked out without checking with a supervisor. FXF recorded the incident like this:

**EMPLOYEE INFORMATION:**

| | |
|---|---|
| Employee ID: | 2591576 |
| Name: | Teryl James |
| Location: | Birmingham, Alabama |
| Position: | Freight Handler |
| Date of Hire: | 07-07-17 |
| Date of Incident: | 07-01-20 |
| Date Prepared: | 07-22-20 |

**SUMMARY:**
Mr. Teryl James is a Freight Handler in the Birmingham Service Center. On July 1, 2020 Mr. James failed to follow instructions, and did not consult with any member of leadership prior to clocking out and ending his work day. Operations Manager Sadiou Malacou saw Mr. James leaving and approached him. Mr. Malacou asked Teryl James if he checked with his Supervisor prior to departing the dock. Mr. James did not answer the question, and said it was time to go home. Operations Manager Sadiou Malacou explained that if he (Teryl James) left without approval, and consulting with leadership, that these actions were considered job abandonment and would result in appropriate consequences. Teryl James would not meet with OM Sadiou Malacou to discuss this situation and left the facility. On June 26, 2020 Mr. James received a coaching session for leaving work after working eight hours. The corrective action expectations stated that Teryl James should report to a supervisor before ending his work day. Teryl James just returned to work from Praternal Leave and was also approved for FMLA.

The next day (July 2, 2020), FXF supervisors recommended that FXF fire James for abandoning his job:

---

**John Hodge**

| | |
|---|---|
| **From:** | Rickey Albert |
| **Sent:** | Thursday, July 2, 2020 1:00 PM |
| **To:** | John Hodge |
| **Subject:** | Teryl James 2591576/ Insubordination |
| **Attachments:** | 7125070220.PDF |

John

I am requesting separation for Teryl James.  He failed to follow instructions as well as job abandonment.  Please read email below and documents attached.

Teryl starts at 1730 and phone #205-902-7983.

Rickey

**From:** Sadiou Macalou <sadiou.macalou@fedex.com>
**Sent:** Wednesday, July 1, 2020 3:12 AM
**To:** Rickey Albert <rickey.albert@fedex.com>; John Ferguson <j.ferguson@fedex.com>
**Subject:** Teryl James

I meet Mr. James in the break room going home. Because the history of him leaving all the time without getting with supervisor I asked him if Tom already send him home. He only keep said that it is time to go home. I told him that he need to get with dock stand to determinate that I we told him before . He said that he done with his work and he is going home. I asked him if we can go in the back room so we discus in private but he did not want to. I said that he need to go back to Tom. He said that he off the clock I him that he can clock back in he said no. I informed him that if he leave without notice/approved  by  manager that will be and job abandonment and it might be some consequence. He said that he also want to  clarify  to me that he ask to show him prove why he have work over but we did not. He  asked him to give me a statement he  refuse that When I try to call Willie to have wittiness he just take off and leave.

---

John Hodge ("Hodge") investigated the request. Hodge interviewed James on July 20, 2020, and James admitted that he knew the rule and violated it:

1. On July 1, 2020, did you leave work even though leadership explained that they still had additional assignments to be completed?
   Teryl: "Well they really did not ask. When I clocked out to leave Operations Manager Sadiou Macalou asked me did the Supervisor let me leave for the night. I told him that I had already clocked out and I believe some other employees did as well."

2. Did you check with your supervisor before you clocked out to leave work?
   Teryl: "No I did not."

3. Have you received corrective action for leaving work without checking with leadership, and additional assignments needed to be completed?
   Teryl: "Yes they talked to me. They also talked to me about working overtime".

4. During the conversation related to the corrective action that you received for leaving work without consulting with leadership, was it explained that you needed to check with a supervisor before ending your workday?
   Teryl: "Yes but they were also talking about overtime."

5. Did Operations Manager Sadiou Macalou explain that if you left work on July 1, 2020 that your behavior is insubordinate and could result in termination?
   Teryl: "He did not say insubordinate, but he did say it was job abandonment."

On July 22, 2020, Hodge concluded that James was insubordinate and recommended that James be fired. FXF fired James on July 30, 2020.

**C. FMLA / Baby James:** While Hodge investigated James' conduct (July 1, 2020 to July 22, 2020), Mrs. James gave birth on July 3, 2020. "Baby James" suffered complications and disabilities because of his premature birth. James sought FMLA paid parental leave to take care of his wife and child, which the U.S. Department of Labor granted:



While James' notice says that leave was granted between July 6, 2020, and July 17, 2020, the parties differ on the exact dates. In any case, the record is clear that James' FMLA leave began after the July 1, 2020, incident that led to his termination and ended before James was fired on July 30, 2020.

**D. EEOC Charge**: James filed a U.S. Equal Employer Opportunity Commission ("EEOC") complaint in December 2020. In it, James alleged that FXF violated these legal provisions:

> I believe I have been discriminated against because of my association with my wife's high-risk pregnancy and requisite need for accommodation. I believe I have been discriminated against and treated differently than my white counterparts as it relates to overtime and work hours. I believe I have been retaliated against after engaging in protected conduct which culminated in my termination. I believe this has all happened in violation of Title VII of the Civil Rights Act, as amended, and every other applicable federal and state statute.

And James recounted the incident that led to his firing like this:

> A couple of days later, I again worked and completed my scheduled shift. I again began to leave with a group of my white counterparts who had all put in 8hrs and were leaving. However, as we were walking out, Sadiou stopped only me again. Sadiou told me that I had to work more overtime. I told Sadiou I did work some overtime that day already and had put in more work hours than my white counterparts who were leaving at the same time as me. Sadiou became irate. He told that he didn't care the hours I had worked and that if I left the building, he would code it job abandonment and fire me. I asked Sadiou to check with any of the other employees to see if they could stay to work but that I desperately needed to get home to my wife who was getting more ill as it related to the pregnancy. I reminded Sadiou that he had done the same thing to me a few days prior and I stayed then despite needing to get to my wife. I told Sadiou I could not do that to my wife again - so I left at my scheduled time to leave. The following evening Sadiou told me I needed to write a statement as it related to job abandonment. I explained to him that it was no job abandonment because I worked the entire time I was scheduled - I had even come in early and worked overtime to make sure my work was completed for the day. I told Sadiou that I believed what he was doing was retaliation because I had told him I'd possibly need accommodations to take care of my wife. Further, I had concerns that I was being targeted like this and, effectively, being treated less favorably than my white counterparts who did not have to experience what I was going through and who also were not taking care of a spouse with a high-risk pregnancy.

### 3. James' Lawsuit

James next sued FXF in this court. He pleaded four counts. Count 1 alleges that FXF violated Title VII by treating James differently because of his race—*i.e.*, he was forced to work overtime, while his white co-workers were not. Count 2 alleges that FXF violated the ADA by discriminating against James because of his association with his high-risk pregnancy wife.[1] Count 3 alleges that FXF violated the FMLA by interfering with James' right to seek and enjoy intermittent or straight leave before Baby James' birth and paternal leave after his birth. Count 4 alleges that FXF retaliated against James for using his FMLA rights.

FXF seeks summary judgment on all counts.

---

[1] In Count II, James also pleaded a claim under Section 504 of the Rehabilitation Act, which he now concedes. (Doc. 45 at 37 n.5).

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But where the evidence is merely colorable or not significantly probative, no genuine dispute of material fact exists, and summary judgment is appropriate. *Id.* at 249-50. Further, if the non-movant responds to the motion for summary judgment with just conclusory allegations, the court must enter summary judgment for the movant. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989).

## DISCUSSION

The court addresses James' counts in the order he pleaded them.

## Count 1:   Disparate Treatment and Race Discrimination under Title VII and 42 U.S.C. § 1981

James (a Black male) alleges that his supervisor Sadiou Macalou ("Macalou") (a Black male) forced James to work overtime that Macalou did not impose on James' white co-workers, then disciplined James when James called out the discriminatory treatment. James alleges that FXF is liable for Macalou's discriminatory treatment of James.

1. The statutes: James pleads Count 1 under Title VII and 1981. Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).

Section 1981 makes it unlawful to discriminate on the basis of race in the making and enforcing of contracts. 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all the

benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

"Both § 1981 and Title VII 'are subject to the same standards of proof and employ the same analytical framework.'" *McCray v. Wal–Mart Stores, Inc.*, 377 Fed. Appx. 921, 923 (11th Cir. 2010); *Sims v. Coosa Cnty. Bd. of Educ.*, No. 207cv704–MEF, 2008 WL 4080769, at *4 (M.D. Ala. Sept. 2, 2008) (Fuller, C.J.) ("The elements of § 1981 race discrimination claim in the employment context are the same as a Title VII disparate treatment claim."). The court will accordingly James' first count—despite multiple causes of action—together.

2. <u>The legal framework</u>: The parties argue their positions under the well-known, three-step *McDonnell Douglas* framework—*i.e.*, plaintiff's prima facie case, defendant's nondiscriminatory reason, and pretext. But recently, the Eleventh Circuit has signaled a departure from *McDonnell Douglas* toward a more basic, Rule 56-based inquiry: Has the Plaintiff submitted enough evidence to allow a reasonable juror to find that the Defendant employer acted against Plaintiff because of his race? *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) ("The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee"); *Tynes v. Fla. Dep't of Juv. Justice*, Case No. 21-13245, 2023 WL 8593114, at *947 (11th Cir. Dec. 12, 2023) ("This rearticulation of the summary judgment standard arose in large part because of widespread misunderstandings about the limits of *McDonnell Douglas*—the same misunderstandings that persist today. A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit.").

This court will follow suit by first detailing the nondiscriminatory reason that FXF offers for disciplining, then firing, James. The court will then decide whether James offers enough evidence to allow a reasonable juror to decide that FXF instead fired James because of his race.

3. <u>Non-discriminatory reason</u>: FXF says that it fired James because James continued to violate FXF's requirement that James check in with management before leaving for the day to ensure that more loading or unloading wasn't necessary. FXF offers evidence that it disciplined James for violating this rule as far back as November 2018:



James received a similar disciplinary 'coaching session' for violating the same rule on June 25, 2020—*i.e.*, one week before he was fired:

FXF offers several records of James being late for work, which included a reminder that James was required to "work the full shift and any reasonable overtime required." (Doc. 39-20).

That history led to July 1, 2020, when Macalou saw James clocking out without checking in with a supervisor—*i.e.*, the same violation he was reprimanded for just six days earlier. Macalou promptly reported the incident like this:

> **From:** Sadiou Macalou <sadiou.macalou@fedex.com>
> **Sent:** Wednesday, July 1, 2020 3:12 AM
> **To:** Rickey Albert <rickey.albert@fedex.com>; John Ferguson <j.ferguson@fedex.com>
> **Subject:** Teryl James
>
> I meet Mr. James in the break room going home. Because the history of him leaving all the time without getting with supervisor I asked him if Tom already send him home. He only keep said that it is time to go home. I told him that he need to get with dock stand to determinate that I told him before . He said that he done with his work and he is going home. I asked him if we can go in the back room so we discus in private but he did not want to. I said that he need to go back to Tom. He said that he off the clock I him that he can clock back in he said no. I informed him that if he leave without notice/approved by  manager that will be and job abandonment and it might be some consequence. He said that he also want to  clarify to me that he ask to show him prove why he have work over but we did not. He  asked him to give me a statement he  refuse that When I try to call Willie to have wittiness he just take off and leave.

And FXF provides notes of James' interview with investigator Hodge that indicate James admitted that he knew he was supposed to check in with a supervisor; failed to do so; and would be considered as abandoning his job if he left that morning without doing so:

> 1. On July 1, 2020, did you leave work even though leadership explained that they still had additional assignments to be completed?
>    Teryl: "Well they really did not ask.  When I clocked out to leave Operations Manager Sadiou Macalou asked me did the Supervisor let me leave for the night.  I told him that I had already clocked out and I believe some other employees did as well."
>
> 2. Did you check with your supervisor before you clocked out to leave work?
>    Teryl: "No I did not."
>
> 3. Have you received corrective action for leaving work without checking with leadership, and additional assignments needed to be completed?
>    Teryl: "Yes they talked to me.  They also talked to me about working overtime".
>
> 4. During the conversation related to the corrective action that you received for leaving work without consulting with leadership, was it explained that you needed to check with a supervisor before ending your workday?
>    Teryl: "Yes but they were also talking about overtime."
>
> 5. Did Operations Manager Sadiou Macalou explain that if you left work on July 1, 2020 that your behavior is insubordinate and could result in termination?
>    Teryl: "He did not say insubordinate, but he did say it was job abandonment."

14

The court finds that FXF has offered a nondiscriminatory reason that comports with FXF's policy requiring reasonable overtime work and against refusing to comply with a supervisor's instruction. The court must now decide whether James offers enough evidence to allow a reasonable juror to decide that James was instead fired because of his race.

4. <u>Race-based evidence</u>: James says that Sean Batemon ("Batemon") and Blade Thompson ("Thompson"), two white hostler-certified freight handlers, were not "targeted to check in with a supervisor or told they needed to work overtime" on June 25, 2020 or July 1, 2020. James argues that this means Macalou targeted James because of his race on those dates. (Doc. 45 at 44; Doc. 44-3, ¶ 19; Doc. 39-4 at 136:7-20; Doc. 39-13 at 196:2-13).

Comparator evidence can create a jury question *if* the comparator is "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1178, 1185 (11th Cir. 2019). That means James must provide evidence that would allow a reasonable juror to find that Batemon or Thompson:

- engaged in the same basic conduct (or misconduct) as James, *see, e.g.*, *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's] property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination");
- were subject to the same employment policy, guideline, or rule as the plaintiff, *see, e.g.*, *Lathem v. Dep't of Child. And Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (holding that a plaintiff's proffered comparators were valid where all were subject to the same "workplace rules or policies"); and,
- shared James' employment or disciplinary history, *see, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (explaining that "[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's proffered comparators).

If James cannot show that he is similarly situated to Batemon and Thompson in these material respects, then evidence about Batemon and Thompson does not raise an inference of race discrimination that would survive summary judgment. *See Lewis*, 918 F.3d at 1228-29 ("An employer is well within its rights to accord different treatment to employees who are differently situated in "material respects"—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories. Finally, the all-material-respects standard serves the interest of sound judicial administration by allowing for summary judgment in appropriate cases–namely, where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot.").

James fails to offer enough evidence to meet this standard. While Batemon and Thompson were subject to the same rules as James, James offers no evidence that they violated the same rules as James. Again, Macalou confronted James on July 1, 2020 "[b]ecause of the history of him leaving all the time without getting with [his] supervisor." (Doc. 39-17 at 5). Because James cannot show that Batemon and Thompson shared this history of repeat violations, no evidence supports James' theory that Macalou confronted James alone because of his race.

Nor does James offer enough evidence that Batemon and Thompson engaged in the same conduct. James offers no evidence whether these men checked with their supervisors before entering the breakroom on July 1, 2020. And as FXF points out, records show that Batemon and Thompson worked *more* overtime than James. Both men also worked overtime on June 24-25, 2020. (Doc. 39-9 at 8, 16). Batemon worked overtime on June 24, 2020, and Thompson started 3.5 hours after James on June 25, 2020 and finished four hours after James left—meaning he worked more overtime.

In short, James offers no evidence that would allow a reasonable juror to find that Macalou treated Batemon and Thompson better than James because James was Black. Because James offers no other evidence about race, the court will dismiss Count 1 because James fails to create a genuine issue of material fact.

## Count 2: Associational Discrimination under Title I of the ADA

James next alleges that FXF discriminated against him because of his wife's disability—*i.e.*, a high-risk pregnancy. This theory is known as "association discrimination."

1. <u>The law</u>: The ADA mandates that employers shall not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also defines "discriminate" to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

In order to establish a prima facie case of association discrimination, James must prove these facts: (1) he faced an adverse employment action, (2) he was qualified for the job at that time, (3) he was known by FXF at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in FXF's termination decision. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1231 (11th Cir. 1999).

2. <u>Discussion</u>: James cannot establish the second required fact—*i.e.,* he was qualified for the position sought. In order to be qualified for the job, an employee associated with a disabled person must still be able to meet the employer's time and attendance requirements. *Id.* ("failure to meet the attendance requirements of [the] job mean[s] that [the employee is] not a qualified individual . . . ."); *see also Pittman v. Moseley, Warren, Prichard & Parrish*, No. 3:01-CV-279-J-21TJC, 2002 WL 2007880 *10 (M.D. Fla. July 29, 2002). To be a qualified individual under the ADA, a person must be able to perform the essential functions of his job with or without reasonable accommodation. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).

Regular attendance is an essential function of most jobs, including FXF freight loaders. *See* (Doc. 39-21 at 3; 39-12 at 10, ¶ 5; 39-16 at 3); *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994) (employers are entitled to expect regular and predictable attendance at work—an essential function of most jobs). Indeed, when he joined FXF in 2013, James signed FXF's Employment Agreement:

> Although Management makes every effort to accommodate individual preferences, business needs may at times require the following conditions to become mandatory: overtime, shift work, a rotating work schedule, or a work schedule other than Monday through Friday. I understand and accept these as conditions of my continued employment.

Despite this requirement, James' attendance records—before and after his wife became pregnant—show a history of absences and tardies. (*See* Doc. 39-20; Doc. 39-19). Again, Macalou cited this history when reporting James' refusal to speak with a supervisor on July 1, 2020.

The court thus finds that James fails to create a genuine issue of material fact on Count 2. As the Tenth Circuit put it, "[i]f [a non-disabled employee] violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]." *Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1083 (10th Cir. 1997) (quoting H.R. Rep. No. 101–485, pt. 2, at 61 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 344)). James refused to comply with disability-neutral FXF policies, so he cannot establish an ADA violation despite his wife's condition.

## Count 3: Interference with FMLA rights

The FMLA gives employees 12 work weeks of leave during a 12-month period to deal with "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). In Count 3, James alleges that FXF interfered with his right to take FMLA leave to care for his pregnant wife, first by telling him to wait to complete his FMLA paperwork until closer

to his wife's due date (September 2020), then by making him work overtime in June and July after finding out that the pregnancy was high-risk.

Even if James could prove that FXF technically violated the FMLA by failing to properly inform him of his leave rights after learning about Mrs. James' high-risk pregnancy,[2] *see* 29 C.F.R. § 825.300(b)(1), James cannot prove an FMLA violation. To explain why, the court breaks James' claim into distinct periods: before and after James' wife went into labor on July 2, 2020.

1. <u>Post-labor interference</u>: James' wife went into labor on July 2, 2020 and gave birth on July 3, 2020. James sought and was granted backdated paid parental leave to be with his wife and newborn son. Because James received and used paid parental leave, no reasonable juror could find that FXF interfered with James' FMLA rights beginning July 2, 2020.

2. <u>Pre-labor interference</u>: That means James must show interference before July 2, 2020. Because James is the non-movant, the court will assume—despite FXF's urging that no evidence supports—that a reasonable juror could find that Mrs. James' high-risk pregnancy was a "serious health condition" that required James to drive his wife to the hospital because she was unable, and to go home to care for her if needed.

To prove an interference claim, James must show that FXF's interference prejudiced James—*i.e.*, FXF's actions prevented James from driving his wife to her pre-labor appointments or caring for her in an emergency. *See Graham v. State Farm Mut. Ins.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (per curiam) ("Even if the defendants have committed certain technical infractions under the FMLA, [a] plaintiff may not recover in the absence of damages."). This harm must be "remediable by

---

[2] FXF argues that James failed to plead this "failure-to-notify" theory in his complaint. The court tends to agree (and thus the argument is preserved), but it needn't decide the waiver issue because James cannot prove that the alleged failure prejudiced him.

either damages or equitable relief." *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014) (quotation marks omitted).

As FXF points out, James fails to point to any date that he needed to leave work to care for his wife but was prevented by FXF. (Doc. 40, Fact #11). Nor does James cite any appointment that his wife missed—or any date that she went to the doctor. (*Id.*). James testified that he would have no trouble working until 2:30am, then taking his wife to her appointments, if the appointments were later than 4:00am. (Doc. 40, Fact #13). And James admitted in his amended answers to Interrogatories and Requests for Admissions—in contradiction to his deposition testimony— that (a) he "cannot recall the exact dates of my wife's pre-natal or OBGYN appointments"; (b) he wrongly testified that she had 4:00am appointments; and, (c) her appointments actually started between 7:00am and 8:00am. (Doc. 39-13, ROG, #2, RFAs #1-3).

In short, James cannot link FXF's alleged interference to any missed appointments, missed emergencies, or any other prejudice. James points to no occasion that his wife needed him at home, and FXF refused to grant him leave. No reasonable juror could find that requiring James to check-in with a supervisor when his shift ended around 2:30am prevented James from taking his wife to 7:00am (or later) appointments. And only pure speculation supports the notion that FXF would have required James to work hours of overtime, or refuse his leave request, if his wife had an appointment or emergency related to a serious health condition. Because James cannot prove that FXF's alleged interference with James' FMLA rights prejudiced him, the court will dismiss Count 3. *See Graham*, 193 F.3d at 1284; *see also Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1434-36 (11th Cir. 1997) (the need to leave early on a few occasions does not establish entitlement to leave under the FMLA).

## Count IV: Retaliation for using FMLA

Finally, James alleges that FXF fired him in retaliation for seeking to use the FMLA before his baby's birth, then exercising his FMLA rights after the birth.

1. <u>The law</u>: The FMLA prohibits employers from retaliating against employees for engaging in protected activities. *Batson*, 897 F.3d at 1328 (citing 29 U.S.C. § 2615(a)(1)-(2)). In order to state a claim of retaliation, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000). The burden on a retaliation claim is heavier than the burden to prove interference, in that the employee must show that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001) (citing *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). The court again separates James' claim into FXF's pre-birth and post-birth actions.

2. <u>Post-birth retaliation</u>: James fails to offer evidence that would link FXF's decision to fire him to James' request for paid parental leave. Again, this claim boils down to timing. Mrs. James went into labor on July 2, 2020 and gave birth on July 3, 2020. James sought paid parental leave a few days later, and that leave was granted and backdated. But supervisors Macalou and Ricky Albert requested James' termination on July 1, 2020—*i.e.*, the day *before* Mrs. James went into labor and several days before James sought FMLA leave. Because James' supervisors decided to fire him before James requested parental leave, no reasonable juror could find that FXF fired James because he sought post-birth, paid parental leave—rather than because James repeatedly refused to check-in with his supervisor before leaving the jobsite, as FXF contemporaneously documented. *See Hurlbert v. St. Mary's Health Care Sys. Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (close temporal proximity is not enough to establish pretext by itself).

3. <u>Pre-birth retaliation</u>: James also claims that FXF retaliated against him before his son's birth because (a) FXF knew that Mrs. James was pregnant; (b) FXF failed to explain James' FMLA rights during the pregnancy; (c) FXF forced James to work some overtime hours; and (d)

FXF disciplined James when James complained about the overtime. (Doc. 1, ¶¶ 66-67).

Even if this series of events amounts to actionable retaliation, James fails to offer evidence that would allow a reasonable juror to find that FXF disciplined James because of an anti-FMLA leave motive or intent. *See Strickland*, 239 F.3d at 1207. As explained, FXF enforced the same check-in and overtime requirements on all similarly situated freight loaders, and undisputed evidence shows that other similarly situated freight loaders worked more overtime than James. Undisputed evidence also shows that FXF disciplined James for leaving without checking-in with a supervisor before and after his wife became pregnant, and FXF fired James because FXF warned him not to leave without checking in six days earlier. In short, the facts establish a nondiscriminatory reason for James' discipline, and James offers no evidence that would prove pretext. So the court finds that no reasonable juror could find that James' discipline for leaving early was motivated by an anti-FMLA leave bias.

—

To sum up, FXF offers evidence that proves a nondiscriminatory reason it disciplined then fired James. James fails to (a) follow Rule 56 and the court's order to contest FXF's facts and (b) offer counter evidence that would allow a reasonable juror to find discrimination, retaliation, or interference—rather than enforcement of FXF's nondiscriminatory policy. So James fails to create a genuine issue of material fact on any count.

### CONCLUSION

For these reasons, the court **GRANTS** FXF's Motion for Summary Judgment on all counts. (Doc. 38). The court will enter a separate order consistent with this Memorandum Opinion that closes this case.

**DONE** and **ORDERED** on July 29, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE